**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KELLE EVERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| | ) | |
| MADISON NATIONAL LIFE | ) | |
| INSURANCE COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Now comes the Plaintiff, KELLE EVERS, by her attorneys, MARK D. DEBOFSKY, WILLAM T. REYNOLDS, and DEBOFSKY, SHERMAN & CASCIARI, P.C., and complaining against the Defendant, MADISON NATIONAL LIFE INSURANCE COMPANY, INC., she states:

*Jurisdiction and Venue*

1.      This is an action between citizens of two different states. Plaintiff KELLE EVERS ("Evers"), at all times relevant hereto, was a citizen of the State of Illinois. Defendant MADISON NATIONAL LIFE INSURANCE COMPANY, INC. ("Madison National"), is a citizen of the state of Wisconsin. The matter in controversy involves an amount at issue in excess of $75,000, exclusive of interest or costs. Therefore, jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332.

2.      In addition, Plaintiff seeks a declaratory judgment, over which this Court has the power to declare the rights and remedies of the respective parties. 28 U.S.C. § 2201.

3.     Venue is proper in this district since a substantial part of the events or omissions giving rise to this claim occurred within the Northern District of Illinois.  28 U.S.C. § 1391(a).

*Nature of the Action*

4.     This is a claim for breach of contract of a group employee benefit insurance policy providing disability income and life insurance issued by Madison National to the City of Holland, Michigan, for and in consideration of premiums paid, to provide monthly disability income payments to Plaintiff in the event she became disabled. Plaintiff alleges that Madison National breached the terms of the group policy by wrongfully terminating disability insurance benefits and life insurance coverage under a waiver of premium benefit, and that Defendant is also guilty of unreasonable and vexatious delay in its refusal to pay such benefits to Plaintiff. As a consequence thereof, Plaintiff is entitled to recover all disability income benefits due up to the date of judgment, reinstatement of life insurance coverage under a waiver of premium, a declaratory judgment requiring continuation of both benefits for so long as she meets the respective policies' definition of disabled, and penalties and attorneys' fees pursuant to 215 ILCS 5/155.

*The Parties*

5.     Plaintiff, Kelle Evers, age 46 (born October 1970) is and was at the time of benefits denial a citizen of the State of Illinois. At the time her disability began, she was a citizen of the state of Michigan.

6.     Defendant, Madison National, is upon information and belief a Wisconsin corporation, maintains its principal place of business in the State of Wisconsin, and is a wholly-owned subsidiary of Independence Holding Company, a Connecticut corporation.

2

## Count I – Termination of LTD Benefits

*Statement of Facts*

7.      From September 1998 until May 22, 2013, Evers was successfully employed by the city of Holland, Michigan. She last held the position of Technology Specialist, working primarily within the Holland Police Department.

8.      Several years prior to May 2013, Evers began experiencing significant lumbar spine pain that was unresponsive to conservative treatment and culminated in lumbar laminectomy surgery in 2009 and a second lumbar laminectomy, with a three-level spinal fusion, in 2010.

9.      Although she was initially able to return to work following her surgeries, Evers continued to suffer severe low back pain and severe radiating cervical spine pain over the next several years. Evers became unable to continuing working due to her pain and the side effects of her narcotic pain medication on May 23, 2013, and has not worked in any capacity since that date.

10.     As a benefit of her employment with the City of Holland, Evers received long-term disability coverage under a group employee benefit policy insured and underwritten by Defendant. (the "Group Policy") (A true and accurate copy of the Group Policy is attached hereto as Exhibit A). For purposes of establishing entitlement to long-term disability benefits, the Group Policy defines the term "Disabled" as follows:

### VIII. DEFINITION OF DISABILITY

A.  **Disability or Disabled** means that during the Elimination Period and your Own Occupation Period you are, as a result of Physical Disease, Injury, Mental Disorder, Substance Abuse or Pregnancy, unable to perform one or more of the Material Duties of your Own Occupation, and, due to such inability, your Work Earnings are less than 80% of your Indexed Predisability Earnings, and you are incapable of earning 80% or more of your Indexed Predisability Earnings.

Your Work Earnings may be Deductible Income. See the "LTD Benefit Calculation" and "Deductible Income" sections.

B. After your Own Occupation Period ends, **Disability and Disabled** mean you are, as a result of Physical Disease, Injury, Mental Disorder, Substance Abuse or Pregnancy, unable to perform one or more of the Material Duties of Any Occupation, and, due to such inability, your Work Earnings are less than 80% of your Indexed Predisability Earnings, and you are incapable of earning 80% or more of your Indexed Predisability Earnings . . . .

C. Loss of License or Certification. For an Insured Person whose occupation requires a license, a restriction or loss of license does not, in itself, constitute a Disability.

D. Preventive Measures. Your inability to perform any of your Material Duties because of preventive treatments or other preventive measures does not, by itself, constitute a Disability.

E. Your Own Occupation Period and Any Occupation Period are specified in the Schedule of Benefits.

(Ex. A, pp. 13-4) (all emphasis in original). The Group Policy further defines the above relevant

terms as follows:

**Any Occupation** means any job for which you are qualified by education, training, or experience regardless of whether you are working in that or another occupation.

**Material Duties** means the duties generally required by employers in the national economy of those engaged in a particular occupation that cannot be reasonably modified or omitted. In no event will working an average of more than 40 hours per week be considered a Material Duty.

(Ex. A, pp. 5; 9). (all emphasis in original). Evers is a Class 2 Participant for purposes of her

LTD benefit.

11.     Prior to the exhaustion of the Group Policy's 365-day LTD waiting period, Evers

submitted a timely application for LTD benefits to Madison National. Upon receipt of her application,

Madison National opened a claim investigation and urged Evers to apply for Social Security

Disability Insurance ("SSDI") benefits and submit a claim for disbursement of her accrued Municipal Employee Retirement System of Michigan ("MERS") pension benefits under the disability retirement provision of that program.

12.     Shortly thereafter, Evers was approved to receive a lump-sum disbursement of her MERS benefits in the gross amount of $98,203.79. The lump sum was paid without an early disbursement penalty following the MERS plan administrator's finding that Evers was "mentally or physically incapacitated from performing [her] former job with the participating municipality or court, and that [her] incapacity is likely to be permanent." *See* Municipal Employees' Retirement System of Michigan Plan Document, § 31(1)(d) (available at https://employerportal.mersofmich.com/SharePointFormsService/Default.aspx?Publication=MERS PlanDocument.pdf) (last accessed January 11, 2017).

13.     Upon the exhaustion of the Group Policy's 365-day LTD waiting period and review of findings of an independent medical examination of Evers scheduled by Madison National, Evers was approved to receive monthly LTD benefits beginning May 23, 2014 in the amount of $3,584.44. Madison National immediately applied a monthly LTD benefit offset of Evers' entire gross MERS lump sum disbursement, prorated over the maximum LTD benefit period, reducing Evers' LTD benefit by $349.85 per month to $3,234.59.

14.     While LTD benefits were being paid, on October 20, 2014, the Social Security Administration found Evers totally disabled, signifying an objective determination that she is incapable of engaging in "any substantial gainful activity." *See* 42 U.S.C. § 423(d)(1)(A). Evers provided notice of the SSDI award to Madison National, which thereby further reduced her monthly LTD benefit by $1,977.00 per month in coordination with the SSDI award and recovered an additional

$9,885.00 in overpaid benefits. Based on the SSDI award, Evers' new ongoing monthly LTD benefit became $1,257.59.

15.     Evers' condition continued to deteriorate after her initial approval for disability benefits and approval for SSDI benefits. On August 20, 2014, an MRI of her thoracic spine revealed spondylosis in the mid to lower thoracic spine with mild anterior osteophyte formations, endplate reactive changes with some disc space narrowing, and a cystic lesion in the right anterior paraspinal region at the T7 level. On March 30, 2015, her treating pain management specialist, Dr. Thomas Basch, opined that because of multiple impairments including postlaminectomy syndrome, cervical spine degenerative disease, thoracic neuritis and disc bulging, and lumbosacral neuritis, Evers remained unable to work outside the home and required ongoing assistance with her activities of daily living. Updated MRI scans of Evers' lumbar spine dated November 17, 2015 and MRI and fluoroscopic angiogram of the right hip dated November 19, 2015 revealed a straightening of her normal lordosis of the spine, moderate facet arthropathy and thickening of the ligamentum flavum causing neuroforminal stenosis bilaterally at L2-L3 and left-sided at L3-L4 and L5-S1, moderate narrowing of the left neural foramen at L4-L5, multiple right hip labral tears, and a moderate-grade tear of the right gluteus minimus tendon involving approximately 50% of the tendon thickness and extending 2.6 cm in length.  Evers also reported shortly thereafter that her migraine headaches were increasing in frequency and were now occurring for three-day stretches every 2-3 weeks without relief from medication.

16.     On January 25, 2016, Dr. Basch completed updated Attending Physician's Statement and Functional Capacity forms, reporting that Evers was "never" able to work on a part time or full time basis, was "unable to perform any aspect of [a] job", and could not be accommodated in any

capacity. He opined that Plaintiff was completely unable to stoop, bend, work with her arms, perform gross or fine repetitive motions, or rotate, flex, or extend her neck; and reported that pain caused a complete inability to function and required her to make frequent positional changes. In the Functional Capacity form, Dr. Basch further wrote that Ms. Evers could not sit, stand, walk, or drive in any workplace capacity, was unable to lift up to ten pounds, was unable to perform repetitive movements of the arms, hands, legs, or feet, and was further restricted due to her use of narcotic pain medications.

17.     Over the same time period, Evers began to suffer additional severe hip pain and underwent several cortisone injections and physical therapy treatment under the care of Vishal Mehta, M.D. Following the failure of those treatments, Evers was recommended to undergo right hip arthroscopy, CAM takedown, labral repair, and debridement surgery. On March 22, 2106, Dr. Mehta sought precertification from Evers' health insurer to complete the procedures; however, the health insurer denied coverage as experimental in a decision dated April 22, 2016.

18.     On May 5, 2016, Madison National sent notice to Evers that her LTD benefits would terminate beyond the Policy's change to the any occupation definition of disability on May 23, 2016. Madison National based its decision upon a non-examining doctor's file review report that determined Evers had "sedentary" work capacity without detail of any specific restrictions and limitations and a Transferrable Skills Analysis that asserted Evers could perform one of five enumerated potential sedentary occupations.

19.     On May 18, 2016, Evers returned to Dr. Basch, who administered another series of bilateral hip injections, and following examination and discussion, opined as follows:

> [She is] becoming more symptomatic. Unfortunately, there are really no spine surgical maneuvers that can be offered. Kelly has done therapy, has appropriate exercises, uses her pain medication safely etc. Even though Kelly has Social Security disability, the private disability insurance is denying her claim. Apparently the thought is that Kelly

can return to work. I certainly do not think this is the case. The migraine headaches, as bad as they can be, are not the reason for her disability. To understand the disability, one has to look at the anatomic issues. Right hip labral tears were first uncovered in November last year. The left hip will have a similar presentation if we study it. The surgery that would be indicated to treat this sort of presentation is being denied. This leaves Kelly in a difficult position. Hip problems are aggravated by the anatomic distortion caused by her multilevel fusion. Psoas muscle activity for instance is markedly altered in a patient such as Kelly where lumbar segments simply do not move. This in turn further distorts hip physiology. The cervical spine is compromised at C6-7 on left, and here radicular pain waxes and wanes. The thoracic spine pain is nonradicular but very consistent with the multilevel disc disease. The lumbar spine has scarring at L5-S1, which irritates nerve roots. Bone scan CT also demonstrates increased uptake above the fusion, consistent with strain at the proximal lumbar spine as one would expect in someone where four segments simply do not move. At times Kelly needs to assume supine posture with her legs bent at knees and hips to relieve the back pain but this of course can escalate hip pain given that joint pathology. Patients with spine pain are often encouraged to transfer forces away from the spine and onto the hips, but for reasons outlined above this won't work in Kelly's case. She takes her pain medication appropriately but if we were to increase dose substantially, as we would have to do if Kelly were placed in a situation where her activities cannot be self controlled, [and] I think it would affect her mental function. Kelly is stuck. She has to use her energy just to get through day-to-day activities given the constant pain. I do not see how she could be expected to perform in the workplace with any sort of consistency.

20.     Over the next two months, Evers underwent updated MRI and CT scans of her lumbar spine and sought additional opinions from two new neurologists regarding a third spinal surgery. Each physician corroborated Dr. Basch's findings of extreme impairment; however, a conclusion that surgery would likely improve her condition could not be reached.

21.     On September 2, 2016, Evers, through counsel, submitted an appeal of Madison National's decision to terminate her LTD benefits (in combination with her appeal of termination of LWOP benefits, detailed in Count II). Included with the appeal were clinical treatment records and opinions from eight different medical providers, a complete copy of the SSA administrative claim file, and witness statement letters from Evers' husband, Michael, and mother and caregiver, Pennie Tomlinson.

22.     Upon receipt of Evers' appeal, Madison National contracted physical therapist Amy

Zornow of First Choice Physical Therapy to conduct a two-day functional capacity evaluation. PT

Zornow subsequently summarized the following limitations:

> Client is limited in her physical abilities due to pain in her: Low Back, Right Hip, inner thighs, Thoracic region, and Neck. Client has limited ability to tolerate walking, projected throughout an 8-hour day. Client is limited in her ability to lift, reach, kneel, crouch, perform seated fine motor activity, forward bend work and squat Client presents with occasional balance challenges. Client's lower extremities are weak. She has some hypersensitivity to light touch in her bilateral UT region. She has poor endurance with activities and needs frequent rest breaks in a lying down/unweighted position. The posture that she assumes when standing or sitting for prolonged periods of time may lead to future pathology due to her many comorbidities. Client's depressed state is a challenge, as well and may impact her physical abilities. She is anxious about physical work and fears continued pain and new injury.

PT Zornow further reported the following regarding Evers' ability to consistently sit:

> Client was able to complete this test [of] 30 minutes of sitting; however. she was fidgety and changed her position many times. At times she leaned forward, slouched and also leaned on the table. Despite the fact she was able to complete the test. I would not recommend that she sit for 30 minutes due to her discomfort. It would be difficult to focus on work tasks.

(A true and accurate copy of the FCE report is attached hereto as Exhibit B).

23.     On December 12, 2016, Madison National (through a third-party administrator,

Disability Insurance Specialists) upheld its decision to terminate Evers' LTD benefits, falsely

claiming that the FCE report shows that Evers can perform the full range of sedentary *and* light duty

work. Madison National did not complete any updated vocational analysis based on the individual

findings of the FCE report, nor did it have any qualified physician review the medical evidence

provided by Evers on appeal.

24.     Madison National's termination of Evers' LTD benefits was and remains against

the weight of the medical evidence and is in direct conflict with  the opinion of its own hired

examining physical therapist. Madison National's decision was the product of biased claims handling including an erroneous and biased interpretation and misstatement of the functional capacity examination, was the result of a conflict of interest, and was reached in bad faith and without any reasonable basis or support for the conclusion reached. Evers thus remains entitled to LTD benefits due since December 11, 2014 plus any interest that has accrued thereon; and she is also entitled to a declaration of rights that her benefits remain payable thereafter so long as she continues to meet the Policy's terms and conditions.

25.     All required avenues of administrative appeal to Madison National have now been exhausted, and this matter is therefore ripe for adjudication.

WHEREFORE, Plaintiff prays for judgment against Defendant in an amount equal to the accrued amount of benefits due through the date of judgment plus interest thereon, a declaration that benefits are to continue so long as Plaintiff continues to meet the policy's requirements for payment of benefits, as well as any and all other relief to which Plaintiff is entitled.

### *Count II – Termination of Life Insurance Coverage*

For Count II of her Complaint:

1-25.   Plaintiff re-alleges paragraphs 1-25 of Count I as Paragraphs 1-25 of Count II of her Complaint, and by that reference, incorporates those allegations herein.

26.     As a benefit of her employment, the Group Policy as provided Evers with term life insurance coverage, which includes a waiver of premium benefit ("LWOP") that enables continuation of such life insurance coverage following cessation of employment, without payment of premium, if she is determined to be Disabled. For purposes of establishing entitlement to the LWOP benefit, the Group Policy defines the term "Disabled" as follows:

**Disabled** or **Disability** means:

1.  during the first 24 months of the Disability period, as a result of Physical Disease, Injury or pregnancy, You are unable to perform with reasonable continuity a majority of the material duties of Your own occupation and You are under the Regular Care of a Physician; or

2.  after the first 24 months, as a result of Physical Disease, Injury or pregnancy, You are unable to perform with reasonable continuity a majority of the material duties of any occupation for which You are qualified by education, training and experience, and You are under the Regular Care and Attendance of a Physician.

(Ex. A, p. 34). The terms "material duties" and "any occupation" are not defined terms under the life insurance portion of the Group Policy. Evers is a Class 2 participant for purposes of group life insurance.

27.     Following completion of the Group Policy's nine month LWOP waiting period, Evers timely applied for and was approved to receive ongoing life insurance coverage under the LWOP provision.

28.     Despite her continued inability to work in any capacity, on May 5, 2016, Madison National sent notice to Evers that her LWOP benefit would terminate beyond the Policy's change to the any occupation definition of disability on May 23, 2016. Madison National based its decision upon a non-examining, file review doctor's report that determined Evers had "sedentary" work capacity without detail of any specific restrictions and limitations and a Transferrable Skills Analysis that asserted Evers could perform one of five enumerated potential sedentary occupations.

29.     On September 2, 2016, Evers, through counsel, submitted an appeal of Madison National's decision to terminate her LWOP benefit (in combination with her appeal of termination of LTD benefits, detailed in Count I). Included with the appeal were clinical treatment records and

opinions from eight different medical providers, a complete copy of the SSA administrative claim file, and witness statement letters from Evers' husband, Michael, and mother and caregiver, Pennie Tomlinson.

30.     On December 12, 2016, Madison National (through a third-party administrator, Disability Insurance Specialists) upheld its decision to terminate Evers' LWOP benefit, erroneously claiming that the FCE report shows that Evers can perform the full range of sedentary *and* light duty work. Madison National did not complete any updated vocational analysis based on the individual findings of the FCE report, nor did it have any qualified physician review the medical evidence provided by Evers on appeal.

31.     Madison National's termination of Evers' LWOP benefit was and remains against the weight of the medical evidence and is in direct contrast to the opinion of its own hired examining physical therapist. Madison National's decision was the product of biased claims handling including an erroneous and biased interpretation and misstatement of the functional capacity examination, was the result of a conflict of interest, and was reached in bad faith. Evers thus remains entitled to reinstatement of life insurance coverage without payment of premium as well a declaration of rights that her life insurance remains eligible for ongoing coverage under the LWOP benefit for so long as she continues to meet the Group Policy's terms and conditions.

32.     All required avenues of administrative appeal to Madison National have now been exhausted, and this matter is therefore ripe for adjudication.

WHEREFORE, Plaintiff prays for judgment against Defendant reinstating her life insurance coverage, a declaration that life insurance coverage is to continue without payment of

premium for so long as Plaintiff continues to meet the policy's requirements for such benefit, as well as any and all other relief to which Plaintiff is entitled.

### Count III – Penalty Under 215 ILCS 5/155

For Count III of her Complaint:

1-32.   Plaintiff re-alleges paragraphs 1-25 of Count I and paragraphs 26-32 of Count II as Paragraphs 1-32 of Count III of her Complaint, and by that reference, incorporates those allegations herein.

33.   There was and was in effect in the State of Illinois at all times relevant hereto, a statute codified at 215 ILCS 5/155, which allows the court to assess penalties and attorneys' fees against an insurance company that unreasonably and vexatiously refuses or delays payment of indemnity due.

34.   Defendant acted unreasonably and vexatiously in violation of § 155 by terminating Plaintiff's disability benefit payments and life insurance coverage despite being provided with full and adequate proof of loss demonstrating her total disability.

35.   Defendant further acted unreasonably by encouraging Plaintiff to file for SSDI and MERS benefits in order to reap the benefit of reducing her monthly LTD payment, then rejecting the findings made under both programs that she was totally (and, in the case of MERS benefits, permanently) disabled.

36.   Defendant also acted unreasonably by forcing Plaintiff to file suit to recover such benefits.

37.   Defendant has demonstrated a history of failing to pay meritorious disability claims under the City of Holland Group Policy. Upon her application for disability benefits, Evers was

told by Holland's Human Resources benefits coordinator, Chanda Schab-Koryto, that "We've never paid LTD before and we aren't going to start now."

38.     Based on the evidence presented, there is no legitimate dispute as to Plaintiff's entitlement to LTD and LWOP benefits; and she is therefore entitled to all benefits that have accrued since the conclusion of the elimination period in the policy as well as penalties, interest and fees.

WHEREFORE, Plaintiff prays that Defendant be assessed the maximum penalty allowable pursuant to 215 ILCS 5/155, and that Defendant be ordered to pay Plaintiff's attorneys fees and court costs, as well as any and all other relief to which Plaintiff is entitled.


January 17, 2017                                    Respectfully Submitted,

                                                   /s/ *Mark D. DeBofsky*_____
                                                   One of the Plaintiff's Attorneys

Mark D. DeBofsky
William T. Reynolds
DeBofsky, Sherman & Casciari, PC
200 W. Madison St., Ste. 2670
Chicago, IL 60606
(312) 561-4040 (phone)
(312) 929-0309 (fax)